**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE MASON and MICHAEL LOMBARDO, individually and on behalf of their minor child, J.L., | |
| Plaintiffs, | Civil Action No. 18-10733 (MAS) (TJB) |
| v. | **MEMORANDUM OPINION** |
| ROMAN CATHOLIC ARCHDIOCESE OF TRENTON, et al., | |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Roman Catholic Archdiocese of Trenton; St. Joseph's Parish; St. Joseph Grade School ("Entity Defendants"); and the Reverend G. Scott Shaffer; Michele Williams; Divina Roche; Rita Dishon; and Christopher Tobin's ("Individual Defendants") Motion to Dismiss.[1] (ECF No. 14.) Plaintiffs Jane Mason and Michael Lombardo, individually and on behalf of their minor child J.L. (collectively, "Plaintiffs"), opposed (ECF No. 15), and Defendants replied (ECF No. 16). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion to Dismiss.

---

[1] The Court refers to Entity Defendants and Individual Defendants collectively as "Defendants".

## I.  Background[2]

Plaintiffs Jane Mason ("Mason") and Michael Lombardo ("Lombardo") are the parents of J.L., who was a student at St. Joseph Grade School ("St. Joseph") in Toms River, New Jersey. (Compl. ¶¶ 1, 2.) J.L. enrolled at St. Joseph in the seventh grade, and attended the school until J.L.'s parents withdrew him during the eighth grade. (*Id.* ¶¶ 3, 52.) J.L. was the only African American student in his seventh and eighth grade classes, and during that time, J.L.'s classmates bullied him. (*Id.* ¶ 3.)

### A.  Parent & Student Handbook

St. Joseph uses a Parent & Student Handbook ("Handbook"), which requires both parent and student signatures acknowledging they "read and agree to be governed by the procedures and policies stated in the Handbook."[3] (Handbook 43, ECF No. 15-3.) Regarding bullying, the Handbook provides:

> A safe and civil environment is necessary for students to learn and achieve high academic standards. Harassment, intimidation, bullying and like behaviors will not be tolerated as they are contrary to the mission of Roman Catholic Schools to educate the whole child in a God-centered environment and to facilitate growth and self-actualization.

(*Id.* 18.) The Handbook requires "[s]chool personnel or individuals" who are aware of bullying to report those incidents "within a school day." (*Id.*) Mason, Lombardo, and J.L. signed the

---

[2] For purposes of the instant motion, the Court accepts all factual allegations in the Complaint as true. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[3] Plaintiffs failed to attach the Handbook as an exhibit to their Complaint, however, they attached it to their Opposition. (ECF No. 15-3.) "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. . . . However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations and quotation marks omitted) (alteration in original). Here, because Plaintiffs' Complaint explicitly references the Handbook, the Court may consider the document at this stage. (*See, e.g.*, Compl. ¶¶ 41-50.)

2

Handbook prior to J.L.'s seventh and eighth grade school years. (*Id.* ¶ 55.) Mason and Lombardo also signed a tuition contract for each school year. (*Id.*)

### B. Bullying

Plaintiffs allege numerous occasions when J.L. was bullied while on school premises. During the seventh grade, two students, "P.C. and T.H., both Caucasian or non-African American, each separately called J.L. a 'nigger' at least five times." (*Id.* ¶ 57.) P.C. also "taunted" J.L. by stating "J.L. likes 'watermelon and fried chicken.'" (*Id.* ¶ 58.) Another student, J.B., called J.L. a "monkey." (*Id.* ¶ 59.)

The bullying continued during J.L.'s eighth grade year. Around December 8, 2016, "J.L. was distraught over his grandmother's death" and posted on social media he was contemplating harming himself. (*Id.* ¶ 61.) The same day, J.L. again posted on social media, and suggested to his classmates that they go to Sky Zone together; however, no one accepted J.L.'s invitation. (*Id.* ¶ 62.) As a result, several of J.L.'s classmates teased J.L. about the classmates declining his invitation, and began pantomiming cutting their wrists when they saw J.L. was present. (*Id.* ¶¶ 62, 67-68, 74-75.)

A student informed St. Joseph guidance counselor, Divina Roche ("Roche"), that J.L. posted on social media that he was contemplating hurting himself, and on December 15, 2016, Roche called Mason to inform her that J.L. was contemplating suicide. (*Id.* ¶ 63.) Mason subsequently took J.L. to a therapist. (*Id.* ¶ 64.)

In February 2017, "J.L.'s classmates began taunting him in person and on social media that his girlfriend, who did not attend St. Joseph, was fake." (*Id.* ¶ 69.) Lombardo reported the incident to Roche, and "Roche promised . . . she would ask the popular kids to help prevent the taunting." (*Id.* ¶¶ 72, 73.)

3

In March 2017, students made J.L. aware of their plans to go to Sky Zone, and the fact that they did not invite him. (*Id.* ¶ 75.) J.L. reported the incident to his teacher, Christopher Tobin ("Tobin"). (*Id.* ¶ 76.) "In response, Tobin insisted that the . . . classmates were really going to Sky Zone and were not harassing J.L.," and Plaintiffs believe Tobin "took no action regarding J.L.'s complaint of harassment." (*Id.* ¶¶ 76, 77.)

Around March 2017, Mason and Lombardo met with Roche and St. Joseph principal, Michele Williams ("Williams"), to discuss J.L.'s bullying. (*Id.* ¶¶ 78, 79.) During the meeting, Roche admitted that earlier that week she had witnessed a student, J.R., harassing J.L. during lunch; Roche described the harassment as "relentless." (*Id.* ¶ 80.) Roche also admitted that other teachers, including Tobin, had witnessed the harassment, and Plaintiffs believe Roche did not intervene or discipline J.R. for the harassment. (*Id.* ¶ 81.) Roche also "claimed St. Joseph could not do anything to prevent the bullying or discipline the harassers—despite witnessing the bullying first-hand—because J.L. would not tell on his classmates." (*Id.* ¶ 82.)

Mason and Lombardo expressed concerns that J.L. could be physically attacked, but "Williams and Roche laughed" and "Williams responded, in sum and substance, 'Oh they're just chickens. They won't actually do anything . . . .'" (*Id.* ¶¶ 85-86.) Williams then told Mason and Lombardo "if they wanted to do something, [they] should contact the police." (*Id.* ¶ 86.)

Later, in March 2017, Mason and Lombardo attended another meeting at St. Joseph with: St. Joseph vice principal Rita Dishon ("Dishon"); Roche; Tobin; and two other unnamed teachers. (*Id.* ¶ 88.) Roche and Tobin both stated they told their students to stop communicating with J.L., and Tobin directed his students to "delete or block J.L. from all social media" and "ignore anything J.L. posted or communicated online." (*Id.* ¶¶ 89, 90.) As a result, Plaintiffs state "Tobin encouraged his class to make J.L., a child clearly being bullied and abused, and the only African

4

American child under his care and supervision, to feel invisible, isolated, and worthless." (*Id.* ¶ 90.)

On May 2, 2017, J.L. found a note in his desk, which had the drawing of a Klu Klux Klan ("KKK") member wearing a white hooded robe, and stating the "KKK is coming 4 u." (*Id.* ¶ 97.) "J.L. knew about the KKK and that the hooded Klansman represented racial hatred and [the KKK] took actions designed to invoke fear of murder and lynching among minorities." (*Id.* ¶ 98.) J.L. became frightened of imminent physical harm, and immediately reported the note to Tobin, who reported it to Roche. (*Id.* ¶¶ 99, 100.) Two students, J.B. and J.M., confessed to authoring the note. (*Id.* ¶¶ 100, 101.) J.B. received a one-day in-school suspension and J.M. received a three-day out-of-school suspension "based on a record of past discipline unrelated to J.L." (*Id.* ¶¶ 102, 104.) After J.B. learned of his suspension, J.L. witnessed J.B. "walk[] toward his friends, smiling and waving his suspension paper above his head, announcing" he was suspended for one-day, and the friends "applauded J.B." (*Id.* ¶ 103.) J.B. was required to apologize to J.L., and afterward, J.L. heard one classmate state that eighth grade was no longer fun because of J.L., and other students called J.L. a "snitch." (*Id.* ¶ 107.)

For comparison, Plaintiffs state that in January 2017, J.L. violated school policy by responding to a Snapchat post during school, and as a result, "J.L. was banned from bringing his Apple iPad to school for one month, and required to borrow a school iPad for use in the classroom, further isolating him from his classmates and singling him out." (*Id.* ¶ 108.) Plaintiffs aver that J.L. received a comparatively harsher punishment for his "minor transgression" than J.B. and J.M. did for their actions. (*Id.*)

On May 4, 2017, Mason and Lombardo attended a meeting with Williams and Roche. (*Id.* ¶ 109.) The parents informed Roche about J.B.'s nonchalant reaction to receiving one-day of in-school suspension, and Roche stated if she knew of J.B.'s reaction she would have given him a

5

harsher punishment; however, Roche took no additional steps to discipline J.B. (*Id.* ¶¶ 110, 111.) "Mason also asked to have a copy of the KKK note during the meeting. Williams refused to provide a copy and explained she wanted to 'protect the school.'" (*Id.* ¶ 112.)

On May 5, 2017, Mason and Lombardo filed a complaint with the Toms River Police Department regarding the KKK note. (*Id.* ¶ 113.) The police visited St. Joseph and issued a report, but "Mason and Lombardo declined to press charges or seek further action from the police." (*Id.*)

Also on May 5, 2017, students stated in front of J.L. during art class "that the left-over paint they mixed together resembled J.L.'s dark complexion." (*Id.* ¶ 114.) On May 8, 2017, Mason and Lombardo withdrew J.L. from St. Joseph and transferred him to the local public school. (*Id.* ¶ 116.)

In July 2017, Mason visited Father Scott Shafer ("Father Scott"), "who is responsible for supervising [St. Joseph's] Parish and St. Joseph." (*Id.* ¶ 117.) Father Scott claimed he was "unaware of the details of any events involving J.L." and stated "he only received a one-paragraph report about the KKK note and that the report said the issue had been resolved." (*Id.* ¶ 118.) Father Scott "did not offer to take any investigative, remedial or preventative action" and failed to discipline J.B. and J.M. after being informed of J.B.'s "defiant response" to his "light punishment . . . ." (*Id.* ¶ 119.)

## II. **Legal Standard**

Courts will examine the legal sufficiency of a complaint and may dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must "contain sufficient factual matter" that "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl.*

6

*Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Although a court must accept as true all factual allegations in the complaint, that tenet is "inapplicable to legal conclusions" and a "pleading that offers 'labels and conclusions' or 'formulaic recitations of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Moreover, on a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

### III. Discussion

Plaintiffs raise the following nine causes of action:

1) Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, *et seq.* as to the Roman Catholic Archdiocese of Trenton ("Diocese"), St. Joseph's Parish ("Parish"), and St. Joseph;
2) 42 U.S.C. § 1981 ("Section 1981") as to all Defendants;
3) negligence as to Diocese, Parish, and St. Joseph;
4) negligence as to Individual Defendants;
5) breach of contract as to Diocese, Parish, and St. Joseph;
6) third-party beneficiary breach of contract as to Diocese, Parish, and St. Joseph;
7) breach of the implied covenant of good faith and fair dealing as to Diocese, Parish, and St. Joseph;
8) third-party beneficiary breach of the implied covenant of good faith and fair dealing as to Diocese, Parish, and St. Joseph; and
9) violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 to -20 as to Diocese, Parish, and St. Joseph.

The Court will address each in turn.

#### A. Count One—Title VI

"Title VI prohibits intentional discrimination based on race in any program that receives federal funding." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011). Thus, it enables a plaintiff to "sue a school for money damages for its failure to address a racially hostile environment." *Id.* (citation omitted). "A plaintiff may recover for alleged 'severe, pervasive, and objectively offensive' student-on-student harassment if the school 'acts with deliberate indifference to known acts of harassment.'" *Id.* (quoting *Davis v. Monroe Cty. Bd. of*

7

*Educ.*, 526 U.S. 629, 633 (1999)). "Actionable harassment deprives the victim of equal access to the school's educational opportunities and has a systemic effect on educational programs or activities." *Id.* (citation omitted). "[S]chool administrators are deemed to act with deliberate indifference 'only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 522 (alteration in original) (quoting *Davis*, 526 U.S. at 648).

Defendants first argue Plaintiffs failed to establish that the harassment was "severe, pervasive, and objectively offensive" because many of the incidents Plaintiffs reference "do not have the required racial component." (Defs.' Moving Br. 5, ECF No. 14-1.) For example, Defendants state that students harassing J.L. about his social media postings and allegedly fictitious girlfriend lacks any racial connotation. (*Id.* at 6.) Moreover, Defendants argue that Plaintiffs failed to demonstrate deliberate indifference because Plaintiffs do not allege that the administrators were aware of many of the bullying incidents. (*Id.* at 5, 7.) Specifically, Defendants argue that the only explicitly racially-motivated harassment they were aware of was the KKK note, and Defendants disciplined the students responsible for it. (*Id.* at 7.)

Plaintiffs oppose, arguing Defendants cite the wrong legal standard, and instead of having to demonstrate "severe, pervasive, *and* objectively offensive" harassment, Plaintiffs need only demonstrate conduct that was "severe *or* pervasive." (Pls.' Opp'n Br. 10, ECF No. 15.) Thus, Plaintiffs contend that even if the Court were to find the numerous instances of harassment were not racially-motivated, the KKK note incident itself is enough to satisfy the Title VI standard. (*Id.* at 11-12.) Plaintiffs support this assertion by emphasizing that the KKK note constituted a threat of physical harm because the KKK is "known for perpetrating lynching against African Americans, and telling J.L. that the KKK was coming for him, constituted a credible threat of racially motivated violence." (*Id.* at 13.) Regarding deliberate indifference, Plaintiffs state that

8

on numerous occasions, Mason and Lombardo reported to Defendants that J.L. was being harassed, but Defendants failed to address that harassment. (*Id.* at 14-16.)

Here, the Court must determine whether the harassment was severe or pervasive and whether Defendants acted with deliberate indifference. Regarding severe or pervasive harassment, the Court finds the KKK note incident alone constitutes severe harassment. Not only did it implicate a threat of physical harm, but it resulted in a police investigation, and J.L. transferred school districts almost immediately after he received the note.

Regarding deliberate indifference, the Court finds Plaintiffs pled sufficient facts to survive a motion to dismiss. Plaintiffs argue J.B.'s single day suspension for leaving the KKK note was inadequate. In reply, Defendants cite to *Whitfield v. Notre Dame Middle School* to support the alleged reasonableness of the suspension. 412 F. App'x 517. In *Whitfield*, the Third Circuit held the defendant school did not act with deliberate indifference because "the school administrators disciplined children following several incidents and implemented a racial sensitivity program." *Id.* at 522. In *Whitfield*, A.R. suffered from racially-motivated harassment on numerous occasions, including one student slapping and spitting on A.R. (resulting in a one-day in-school suspension); another student accusing A.R. of not showering, smelling foul, and stating, "[i]f I didn't take a shower I would look like you[,] black" (resulting in the student having to apologize for the comment); and another student scratching A.R., causing abrasions that were treated at an emergency room (resulting in a two-day out-of-school suspension). *Id.* at 519-20 (alterations in original).

Here, although "courts should refrain from second-guessing the disciplinary decisions made by school administrators," one could reasonably find that a single day of in-school suspension for what essentially amounts to a threat of physical violence against J.L. was "clearly unreasonable." *Id.* at 521-22 (quoting *Davis*, 526 U.S. at 648). Additionally, unlike the school

9

district in *Whitfield*, Defendants in the instant matter did not take any action other than the suspension. 412 F. App'x at 522 (holding the district court properly concluded the school did not act with deliberate indifference because the harassing students were disciplined and the school "implemented a racial sensitivity program"); *but see Price ex rel. O.P. v. Scranton Sch. Dist.*, No. 11-95, 2012 WL 37090, at *7 (M.D. Pa. Jan. 6, 2012) (distinguishing that matter from *Whitfield*, finding, among other things, that the school "did not implement any policy to educate their students or employees about sexual harassment"). Additionally, neither Roche nor Father Scott took any further remedial action after learning of J.B.'s "defiant response" to his one-day suspension. (Compl. ¶¶ 111, 119.)

Further supporting Plaintiffs' deliberate indifference argument is that, on another occasion, Roche admitted she witnessed students "relentless[ly]" harassing J.L., but failed to intervene, and Williams's refusal to provide Mason and Lombardo a copy of the KKK note during their meeting because Williams wanted to "protect the school." (*Id.* ¶¶ 80, 112.) Defendants, therefore, failed to demonstrate that Plaintiffs have not sufficiently pled a Title VI claim. The Court, accordingly, denies Defendants' Motion to Dismiss Count One.

### B. Count Two—Section 1981

"To establish a right to relief under [Section] 1981, a plaintiff must show that (1) he [or she] belongs to a racial minority; (2) 'an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in' [Section] 1981." *Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir. 2002) (quoting *Brown v. Phillip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001)).

In support of dismissing Count Two, Defendants repeat their above allegations. (Defs.' Moving Br. 9.) Defendants further argue that in the context of Section 1981, failure to act does not support a purposeful discrimination finding. (*Id.*)

10

In opposition, Plaintiffs contend that Defendants again misstate the proper standard, and rather, "a showing of deliberate indifference supports a finding of purposeful discrimination." (Pls.' Opp'n Br. 18.) Plaintiffs further repeat their earlier arguments that students harassed J.L. for nearly two years, Defendants had actual knowledge of that harassment and admittedly took no action, and as to the KKK note incident, Defendants imposed an inadequate punishment on the responsible students. (*Id.* at 18-19.) In reply, Defendants repeat their argument that Plaintiffs failed to demonstrate deliberate indifference. (Defs.' Reply Br. 5, ECF No. 16.)

The Third Circuit has held, "The standard for establishing an intent to discriminate on the basis of race" is the same in Title VI and Section 1981 claims. *NCAA*, 288 F.3d at 569 (citation omitted). Further, in *S.H. ex. rel. Durrell v. Lower Merion School District*, the Third Circuit provided, "In cases involving action (or inaction) toward an individual that results in a violation of rights, . . . the Supreme Court has readily accepted that deliberate indifference can create a viable cause of action." 729 F.3d 248, 264 n.24 (3d Cir. 2013) (citation omitted). Therefore, a showing of deliberate indifference is sufficient to satisfy intent in the context of Section 1981 claims. Because the Court finds Plaintiffs sufficiently pled deliberate indifference, the Court denies Defendants' Motion to Dismiss Count Two.

### C. Counts Three and Four—Negligence

Defendants contend the Court should dismiss Count Three because the Charitable Immunity Act, N.J.S.A. 2A:53A-7, precludes it. "[A]n entity qualifies for charitable immunity when it (1) was formed for nonprofit purposes; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Ryan v. Holy Trinity Evangelical Lutheran Church*, 815 A.2d 419, 424 (N.J. Sup. Ct. 2001) (citation omitted). Determining whether the Act applies requires a fact-sensitive approach. *Id.* at 425-26.

11

Plaintiffs concede the Charitable Immunity Act bars Count Three. (Pls.' Opp'n Br. 19.) Plaintiffs, however, argue the Charitable Immunity Act does not bar claims as to the Individual Defendants. (*Id.*) Defendants, however, contend the Charitable Immunity Act explicitly provides that "[n]o nonprofit corporation . . . or its trustees, directors, officers, employees, agents, servants or volunteers shall . . . be liable" under the Act. N.J.S.A. 2A:53A-7. (Defs.' Reply Br. 5.) Thus, Defendants argue the Court must dismiss Count Four because all of the Individual Defendants are St. Joseph employees. (*Id.* at 6.)

Plaintiffs fail to cite any case law addressing their assertion that the Charitable Immunity Act does not apply to individuals. Further, Plaintiffs fail to address that the Act's plain language states that it applies to individuals. Specifically, the Charitable Immunity Act provides: "No nonprofit corporation, society or association organized exclusively for religious, charitable or educational purposes **or its trustees, directors, officers, employees, agents, servants or volunteers shall**, [except under certain circumstances] be liable to respond in damages . . . ." N.J.S.A. 2A:53A-7 (emphasis added). Moreover, in *Hehre v. DeMarco*, the New Jersey Superior Court, Appellate Division, although confronted with a different question, emphasized that the Charitable Immunity Act applied to the individual actors expressly referenced in the statute. *Hehre v. DeMarco*, 24 A.3d 836, 841 (N.J. Super. Ct. App. Div. 2011), *certif. denied*, 35 A.3d 682 (N.J. 2012).[4] Therefore, because Plaintiffs concede the Charitable Immunity Act applies to Entity Defendants, and the Act by its very terms applies to Individual Defendants, the Court grants Defendants' Motion to Dismiss Counts Three and Four.

---

[4] The *Hehre* Court further provided: "The fact that the High School charges tuition to its students does not affect its charitable immunity protection." *Hehre*, 24 A.3d at 840.

12

### D. Counts Five and Six—Breach of Contract

Defendants argue Diocese and Parish are non-parties to the Handbook, and therefore the Court must dismiss the breach of contract claims as to those two parties. (Defs.' Moving Br. 11.) Specifically, Defendants state the Complaint itself provides that the Handbook "serves as an agreement between parents and students with St. Joseph" and thus the claim impermissibly captures Diocese and Parish. (*Id.* (quoting Compl. ¶ 42).)

Regarding Count Five, Plaintiffs state the Handbook contains numerous examples demonstrating that Diocese and Parish control St. Joseph. (Pls.' Opp'n Br. 20.) They cite five examples supporting this argument, stating the Handbook provides: (1) St. Joseph "exists to educat[e] . . . under the direction of the Diocese"; (2) the "curriculum . . . is governed by the Diocese"; (3) when a student is found to have sold or used drugs "a memorandum agreement, as prescribed by the Diocese . . . exists with St. Joseph['s] . . . and law enforcement to report such activity"; (4) Diocese provided information regarding St. Joseph's policy for cyber-bullying; and (5) regarding school sports, "all elementary sports programs in the Diocese . . . are under the direction of the Diocesan Athletic Commissioner . . . ." (*Id.* at 20 (quoting Ex. B, ECF No. 15-3).) Thus, Plaintiffs argue that "[b]y controlling the School's curriculum and policies, the Diocese and Parish are also parties to the Student Agreement, which promises students a learning environment free from harassment." (*Id.* at 21.)

Plaintiffs rely on *Gargano v. Diocese of Rockville Centre*, 888 F. Supp. 1274 (E.D.N.Y. 1995), in support. The Court in *Gargano* was faced with the question of whether a catholic school teacher could maintain a suit against both the employer school and the diocese that oversaw the school. *Id.* at 1277. The contract at issue was an employment contract, and the plaintiff initiated the action after she was denied employment at a new school following the closing of her old school; the same diocese oversaw both schools. *Id.* at 1277-78. The diocese argued it could not be liable

13

for breach of contract because "there was no employment relationship between" it and the teacher. *Id.* at 1278. The District Court for the Eastern District of New York, discussing case law regarding "joint employer" relationships, determined the diocese could be liable for breach of contract because "more than one entity can employ the same individual at the same time," and further found the diocese exercised sufficient control over the employer school to qualify as a "joint employer." *Id.*

Regarding Count Six, Plaintiffs argue Defendants fail to address Plaintiffs' third-party beneficiary arguments, and emphasize that "the nature of a third-party beneficiary breach is to hold a non-party to a contract liable based on that party's status as a third-party beneficiary under the contract." (Pls.' Opp'n Br. 21.) Defendants' Reply reiterates their assertion that Diocese and Parish were not parties to the contract, and further states that the Handbook's agreement, which the students and parents sign, makes "no mention of any contractual relationship between ... Diocese or ... Parish, and the parents." (Defs.' Reply Br. 7.) They further emphasize that the Handbook "sets forth no promises or duties on behalf of ... Diocese or ... Parish concerning the implementation and enforcement of the school's anti-harassment and bullying policies." (*Id.*)

Defendants contend the *Gargano* decision is inapposite because there, the plaintiff initiated the action after she was not hired for a teaching position based on a teacher handbook "provided by the school ... [that] contained the procedures to be followed by the Diocese in selecting teachers for new schools in the diocese." (*Id.*); *see also Gargano*, 888 F. Supp. at 1282-83. The teacher in *Gargano* based her breach of contract claim on the employer school and the diocese's hiring practices, and the handbook in that action provided that the diocese had control over those hiring practices. (Defs.' Reply Br. 7.) Therefore, Defendants urge the Court to view the *Gargano* decision narrowly, and find there is nothing in the Handbook that contains "promises or duties on

14

behalf of . . . Diocese or . . . Parish concerning the implementation and enforcement of the school's anti-harassment and bullying policies." (*Id.*)

Preliminarily, Plaintiffs' arguments focus on whether Diocese is a party to the contract, but Plaintiffs fail to provide any support for their contention that Parish is also a party to the contract. In fact, all of Plaintiffs' references to the Handbook regard Diocese, and not Parish.

Moreover, *Gargano* is inapposite to the instant matter. The Court in *Gargano* specifically considered whether two entities—the school and the diocese—could jointly oversee hiring practices. The case law the *Gargano* Court discusses focuses on employer-employee relationships, and Plaintiffs fails to demonstrate why the Court should broadly read the *Gargano* decision as applying to all contractual relationships, and not merely employment contracts. Plaintiffs, therefore, have failed to adequately allege Diocese and Parish are parties to the contract. The Court, accordingly, dismisses without prejudice Counts Five and Six as to Diocese and Parish.[5]

### E.     Counts Seven and Eight—Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants next contend that under New Jersey law, a party may not bring both a breach of contract and breach of implied covenant of good faith and fair dealing claim when the conduct at issue relies on the same set of facts. (Defs.' Moving Br. 12-13.) Thus, Defendants argue the Court should dismiss Counts Seven and Eight in their entirety, or alternatively, as to Diocese and Parish. (*Id.* at 13.)

Plaintiffs contend that Defendants fail to acknowledge they pled the following two distinct breaches: "(1) that Defendants breached the [Handbook agreement] by failing to provide a safe

---

[5] Because the Court dismisses Count Five, the Court must also dismiss Count Six because both claims rely upon the Court finding Diocese and Parish are parties to the Handbook. The Complaint, however, states that J.L., not Diocese or Parish, is the third-party beneficiary. (*See* Compl. ¶ 168 ("J.L. is a third-party beneficiary of the contract between Mason and Lombardo and Defendants Diocese, Parish[,] and St. Joseph.").)

15

and orderly learning environment free from harassment . . . ; and (2) that Defendants breached the implied covenant of good faith and fair dealing" by unreasonably enforcing the Handbook agreement. (*Id.* at 22.) Therefore, Plaintiffs argue that their breach of contract claims and breach of the implied covenant of good faith and fair dealing claims are distinct from one another. (*Id.*)

Defendants' Reply reiterates their earlier argument that Plaintiffs' breach of the implied covenant of good faith and fair dealing claims improperly duplicates Plaintiffs' breach of contract claims. (Defs.' Reply Br. 8.) Alternatively, Defendants state that if the Court agrees that Plaintiffs failed to demonstrate that Diocese and Parish were parties to the contract, then the Court should dismiss the implied covenant of good faith and fair dealing claims as to those parties because "non-parties to a contract cannot be held liable for a breach of contractual duty of good faith and fair dealing." (*Id.* at 9 (citing *FDIC v. Bathgate*, 27 F.3d 850, 876 (3d Cir. 1994)).)

"[I]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other part[ies] to receive the fruits of the contract; in other words, . . . there exists an implied covenant of good faith and fair dealing." *Sons of Thunder v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997) (citation omitted). "To establish a breach of the covenant of good faith and fair dealing, a plaintiff must show that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *T.J. McDermott Transp. Co., Inc. v. Cummins, Inc.*, No. 14-4209, 2015 WL 1119475, at *13 (D.N.J. Mar. 11, 2015) (citation and internal quotation marks omitted). Courts, however, "have repeatedly recognized that a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the breach of contract." *Elite Pers. Inc. v. PeopleLink, LLC*, No. 15-1173, 2015 WL 3409475, at *3 (D.N.J. May 27, 2015) (internal quotation marks and citation omitted). "The parties

16

must have a valid contract in order for there to be a breach of an implied covenant of good faith and fair dealing." *Iwanicki v. Bay State Milling Co.*, No. 11-01792, 2011 WL 6131956, at *4 (D.N.J. Dec. 7, 2011).

Preliminarily, the Court notes that because Plaintiffs have failed to demonstrate Diocese and Parish are parties to the contract, the Court dismisses without prejudice Counts Seven and Eight as to those parties. The Court, however, denies Defendants' motion as to St. Joseph.

One may raise a breach of good faith and fair dealing claim to remedy the following situations:

> (1) [T]o allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations.
>
> (2) [T]o allow redress for a contracting party's bad-faith performance of an agreement, when it is pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and
>
> (3) [T]o rectify a party's unfair exercise of discretion regarding its contract performance.

*Alin v. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308, at *12 (D.N.J. Mar. 31, 2010). Here, Plaintiffs state, among other things, that St. Joseph unfairly exercised its discretion in determining how to respond to J.L.'s bullying, and therefore their breach of implied covenant of good faith and fair dealing claims are sufficiently distinct from their breach of contract claims. (Pls.' Moving Br. 22-23.) The Court agrees.

Plaintiffs state that in enforcing rights under the Handbook, Defendants unfairly exercised discretion in telling other students not to speak with J.L., thereby further ostracizing him from his classmates. (*Id.*) This differs from the breach of contract claim, in which Plaintiffs contend Defendants failed to provide J.L. a learning environment free from harassment. (*Id.*) The Court,

17

accordingly, denies Defendants' motion as to St. Joseph because Defendants did not demonstrate that Plaintiffs failed to state a claim.

### F. Count Nine—NJCFA[6]

The NJCFA "is intended to protect consumers by eliminating sharp practices and dealings in the marketing of merchandise and real estate." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F. 3d 494, 514 (3d Cir. 2006) (citation omitted). Further, the NJCFA "seeks to protect consumers who purchase goods or services generally sold to the public at large," rather than "cover every transaction that occurs in the marketplace . . . ." *Id.* (internal citations and quotation marks omitted). Thus, a threshold question for courts is whether the NJCFA is applicable in a given situation.

Defendants, citing *B.K. v. Saddle River Day School*, No. 5525, 2014 N.J. Super. Unpub. LEXIS 1006, at *24 (N.J. Super. Law. Div. 2014), contend that Plaintiffs cannot raise an NJCFA claim under the instant facts because "private education is not a service that is marketed to the public for sale." (Defs.' Moving Br. 13.) Alternatively, Defendants argue the Court should dismiss the NJCFA claims as to Diocese, Parish, and St. Joseph because "[d]isciplinary action is not a good or service generally offered for sale to the public." (*Id.* at 14 (quoting *Saddle River Day Sch.*, 2014 N.J. Super. Unpub. LEXIS 1006, at *29).)

Plaintiffs respond, stating that this Court in *Harnish v. Widener University School of Law*, 931 F. Supp. 2d 641 (D.N.J. Mar. 20, 2013), denied a motion to dismiss an NJCFA claim brought against a private law school. (Pls.' Opp'n Br. 24-25.) Plaintiffs also cite *Glenz v. RCI, LLC*, No. 09-378, 2010 WL 323327 (D.N.J. Jan. 20, 2010), for the proposition that "the fact that the

---

[6] The Court notes that Defendants only disputed Plaintiffs' NJCFA claim on the basis that NJCFA was inapplicable to the instant facts. Defendants did not aver that Plaintiff failed to sufficiently plead the matter. (*See* Defs.' Moving Br. 13-14; Defs.' Reply Br. 9-10.) The Court, accordingly, does not reach that matter.

18

education provided by [St. Joseph] might only be suitable to a limited clientele does not change the fact that the [NJ]CFA applies to the education offered by the [s]chool." (*Id.* at 25) (internal quotation marks omitted).

In reply, Defendants reiterate their prior arguments regarding *B.K.* (Defs.' Reply Br. 9-10.) Further, Defendants argue *Harnish* is inapposite because there, the educational institution "was misrepresenting the employment opportunities that would be available to its graduates," as opposed to school disciplinary policies. (*Id.* at 10.)

Here, Defendants' only support for their argument is an unpublished New Jersey Superior Court decision that is not binding on the Court. Moreover, contrary to Defendants' assertion, Plaintiffs' NJCFA claim does not rely solely on the Entity Defendants' disciplinary practices, but also on the Entity Defendants failing to provide J.L. with an adequate learning environment. The Court in *Harnish*, also found that a private school could, in fact, be liable under the NJCFA.[7] Accordingly, Defendants' arguments lack persuasion. The Court, therefore, finds Defendants failed to establish the NJCFA does not apply under the instant facts.

The Court, however, dismisses without prejudice Plaintiffs' NJCFA claim as to Diocese and Parish. Plaintiffs base their NJCFA claim on Entity Defendants' actions under the contract, yet the Court found Plaintiffs failed to demonstrate Diocese and Parish were parties to that contract. The Court, therefore, finds good cause to allow Plaintiffs to replead the NJCFA claim as to Diocese and Parish.

---

[7] The Court recognizes the *Harnish* Court provided, "While the thread of plausibility may be slight, it is still a thread. At this motion to dismiss stage, under New Jersey's broad remedial statute, [the p]laintiffs have sufficiently pled an unlawful affirmative act under the NJCFA." *Harnish*, 931 F. Supp. at 651-52.

19

## IV. Conclusion

The Court denies Defendants' Motion to Dismiss Counts One and Two. The Court grants with prejudice Defendants' Motion to Dismiss Counts Three and Four. The Court grants without prejudice Defendants' Motion to Dismiss Counts Five and Six as to Diocese and Parish. The Court grants without prejudice Defendants' Motion to Dismiss Counts Seven and Eight as to Diocese and Parish. The Court denies Defendants' Motion to Dismiss Counts Seven and Eight as to St. Joseph. The Court grants without prejudice Defendants' Motion to Dismiss Count Nine as to Diocese and Parish. The Court denies Defendants' Motion to Dismiss Count Nine as to St. Joseph.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**